Case number 141611, Bars Products Inc v. Bars Products Intl Inc et al. Oral argument not to exceed 15 minutes per side. Mr. Stephen Susser for the appellant. May it please the court and good morning. My name is Stephen Susser. I represent Bars Products Inc. I would ask for five minutes of rebuttal. This case asks a question. The question is, can a simple assignment of intellectual property assets be converted into a 40-year restraint of trade? That was a question that was posed to the jury. That was a question the jury was forced to grapple with. In the end, it is Bars Products position, I'll call it Bars, that that was an unfair task for the jury and ended up being unfair to Bars as a result. There are three buckets of issues to address, one being breach of contract. And there were two theories, there have been two theories of breach of contract throughout this litigation. There was a theory that started at the beginning of the case and went all the way until the appellant responds. And that theory was a restraint of trade theory. That the assignment operated as a perpetual non-compete equivalent, stopping Bars from selling. Talk about a non-compete agreement. Most of the cases on which you rely are a little bit different from this one, correct? I mean, they arise in the context of an employment situation where somebody agrees upon leaving an employer not to compete for a certain period of time. And that's where all that reasonableness case law arises from, correct? There are certainly employment situations appear to be the most common. Because it's not apparent to me that the cases from which you derive most of your support for viewing the case in the way you are attempting to frame it have anything to do with this litigation. And apparently, it wasn't apparent to the district court either. Well, Your Honor, I think that there was never really any question that there's no non-compete provision here. Well, I guess what I'm asking is, to what cases would we look that would provide the most helpful analogy to this situation? If that's the case, Your Honor, I would respectfully suggest that it's not a restraint of trade case at all. It would not be a non-compete case. So you don't have any cases that are outside the employment context that would support that theory? Well, Your Honor, we're not . . . the theory . . . The theory . . . I mean, what we're talking about is the way your opening remark, much of your brief, is devoted to trying to frame this case as if it were an employment case. And all the various case law that has evolved, developed in the context of those cases, you're trying to argue it's applicable here. I just told you it's not immediately apparent to me that that's so. So what I want to know is, why do you say it is applicable based on the case law supporting your theory? That's the question. Okay, let me try to answer that in two parts. First to say, the Worges case was a sale of a business. That was an implied covenant not to solicit former customers. The Getter case from the Michigan Supreme Court was a sale of a business. That found there is an implied covenant under certain circumstances not to solicit former customers. Both of those cases have been called into question recently by the Michigan Supreme Court in the Rory case in 2007, which said that if the court cannot read into a contract, an unambiguous contract, restraints of trade that aren't there. So that is all a, that's the miasma. What if they are there? I'm sorry, Your Honor? What if they are there and the parties have at arm's length agreed to them? If the parties have at arm's length agreement, as was the case, by the way, with these parties in 1998, when they had a specific license agreement with a non-compete, then you have a non-compete agreement, and it's stated, spelled out clearly, and it's either followed or not followed. But that wasn't the case. A non-compete agreement here just for territory? You take the domestic and we take the foreign and vice versa? Well, that's just it, Your Honor. There was no non-compete. That's part of the problem. There was a simple assignment, assignment of intellectual property assets. No statement, no word, no mention of a non-compete. And, in fact, BPI does not dispute that. BPI admits there's no non-compete agreement, and BPI admits there's no implied covenant not to solicit foreign customers. The problem is the case was- The licensing agreements, of course, divvied up the territory, did they not? There was a license agreement, Your Honor. Well, the assignments in 1973 didn't so much divvy up the territory as, say, Free Bar, Bar's former name, said these eight trademarks are being assigned to you, are transferred over. That was all the foreign business that Free Bar did at the time. It gave its foreign business at the time, which was selling to distributors, a specific number of distributors, under specific trade names, it said this is yours in 1973. That was what was assigned. And that's all that was assigned. There was a Bar's paid BPI for licensing to sell in Mexico. Yes, Your Honor. That's exactly right. There was a license agreement because they had a trademark in Mexico. We wanted to sell in Mexico, and we entered into a six-year agreement. It ended in 2004, I believe. But it was a six-year agreement, I think, 98 to 2004, where we sold in Mexico. They got royalties, and that ended and stopped. That, by the way, did have a non-compete. It's not suggestive of this arrangement that lasted about 30 years, that they were sole partners in marketing this business in different parts of the world. Ironically, Your Honor, I think it's suggestive of the opposite. If there truly had been some sort of restraint of trade in 1973, there would be no need for a non-compete agreement in 1996. It's only because there was never any divvying up of the world that there was. . . The term restraint of trade, I mean, I think of that as an antitrust term, of course, but you use it even though . . . I don't know. It just doesn't strike me as the way that we should look at this. I know you're challenging the duration and scope of the 30-year partnership, right? Is that primarily your contention today? That's one, Your Honor, and I use restraint of trade to combine a non-compete theory and an implied covenant not to solicit former customers. I'm putting them together. Former or foreign? Former. Former customers. Because there was never any division of the world. You deny there's a geographic division? I do deny that, Your Honor. There was never any division of the world. That's a construct. There was an assignment of specific intellectual property assets. In fact, it's as simple as saying I assigned . . . Each could sell wherever they chose in the theme that you come up with. Each could sell wherever they chose with one caveat, Your Honor. If there were a valid trademark registration in country one of the 192 countries, if in one of those countries there was a valid trademark registration held by BPI, let's say in Argentina for a specific trade name, we could not under the laws of Argentina probably sell product using that name. Otherwise, no, there was no agreement that you could sell here, we could sell here. Not at all. The jury found significant damages. Yes, Your Honor. And the grounds for that are . . . do you think they're clear? Do we know the bases? We don't because the jury was given the wrong theory. The jury was told there was . . . that the parties entered into an agreement that prevented bars from competition with BPI. That's what the jury was told BPI's position was. BPI's position on appeal is not that. BPI's position is there's no non-compete agreement, there's no implied covenant not to solicit former customers. It's a simple assignment. And as a simple assignment, Your Honor, it would be like assigning a television. I assign my television, I get $50 in return. Is this the argument that the jury heard from you? The jury heard . . . Simple folks and they nevertheless came up with these numbers? No, Your Honor. What the jury heard was BPI was alleging a restraint of trade or a non-compete theory. I'm talking about the defense. I'm sorry, Your Honor? I'm talking about your defense. Our defense was that there was no non-compete agreement, there was no implied covenant not to solicit former customers, and if there were an implied covenant not to solicit former customers, there's no evidence of any former customers being solicited, and BPI does not dispute that. We did not claw back or try to recapture the customers who we were dealing with in 1973. That never happened. And most of the damages, Your Honor . . . I think your time is up. I'm worried that we're getting into your rebuttal time. Thank you, Your Honor. Thank you. I was looking for something . . . I was . . . The question. Okay. Mr. . . . May it please the court. Jerry Catwin on behalf of BPI, which is obviously one of the few cases where the names are the same. I believe in my brief, hopefully I've answered all the questions. I can't think of anything else to say other than my brief, but I'm happy to answer any questions. I don't want to . . . This is the way we do it in California. I think I've said it all. So if you have questions, I'm happy to . . . You don't ever force a party to argue who doesn't really want to argue, but I think a while back, I think your adversary moved to change the oral argument date. Did you move to change it? I didn't move to change it, but I . . . Once someone else asks for oral argument, I feel I'm compelled to come and answer any questions the court has. I'm happy to say that I believe that . . . I mean, I can say what I said in my conclusion. I believe the jury was correct. I think they waived all their . . . Any . . . Well, why are we here today? You think they waived every . . . I didn't . . . I . . . I'm sure that . . . I didn't . . . You have a fair amount of risk here, counsel, don't you? And you don't want to make any arguments? All right. I will make this argument. There was a contractual relationship between . . . The argument is that the jury was misinstructed, I mean grievously misinstructed, and therefore the verdict is that we should throw it out. We're considering that. I'm saying that the jury was properly instructed. They didn't object to any of the jury instructions. No objection at all. And they waived that under the law. They didn't object to any of the interrogatories, the special verdict. They waived that under the law. They didn't object . . . They jointly stipulated all those things, the jury instructions, the verdict forms, and so they waived all that. And I think the case is pretty clear that this was . . . When you take a step back a second, this is a contract between two men. They paid $500,000 for the rest of the world. That was not automotive crazy in 1973, and that was their territory. $500,000 was paid by . . . What's the duration of this? Is it in perpetuity? It's a . . . They bought the . . . I got the geographic scope. What about the duration? They bought the rights, I believe, in perpetuity, yes. But assuming it's not in perpetuity, certainly for a reasonable time, and when you pay $500,000, which was a significant amount of money back in 1973, the jury found that . . . And they were instructed as to whether it was reasonable or not. Then it's a reasonable time, I believe. Where are we now? We're beyond . . . We're 40 years. I understand that, but let's say I buy a Chrysler or . . . Let's say that's reasonable, 40 years. If I buy a Sony outlet or an Apple outlet, and I pay significant dollars for that, and that is contractually my territory, unless they say this territory is going to . . . I mean, in those days, they believed this was . . . They were buying the rights in perpetuity. That's what these two guys thought, because $500,000 was . . . They started in a garage. Remember, $500,000 was a lot of money for these guys. That's what the intent of the parties were. Now, if I buy now an Apple franchise, or I partner with Apple and say I get all the rights to China, unless it's limited, I believe that would go on and on and on. Can I ask you . . . Yes. Neither one of you, as I read your briefs, is complaining about any error in the jury instructions. Correct. But your adversary has offered a view of the case that probably is not consistent with what the jury was charged, given that the jury was given a pretty straightforward breach of contract claim. If it is the sort of claim that the district court thought it was, is there any additional . . . Is there any requirement as to reasonableness of the time limit? You said the jury was charged about that, but I wasn't sure what context you meant. There was a jury instruction as to the reasonableness amount of time, and we cite that in our brief, and the duration. I mean the duration and the location, and there was not a verdict question about it. Well, what's the source of . . . And if it's an arm's length transaction, there has to be something else special that would require giving that instruction. The one about reasonable time? I'm asking you where that comes from. What law? Same sort of question I was asking him. All right. The law . . . They claimed there was a non-compete, and they wanted that to show that whether this contract . . . Well, did the jury instructions permit the consideration of the contract as a non-compete? I believe the jury instructions, the contract, whether it was limited in a number of years the contract, not whether it was a non-compete, but whether the contract itself . . . You have a contract. A jury, whether it's a non-compete or a contract, it's an agreement. And so the jury was charged with whether this agreement was reasonable for the amount of years that it was made for, the duration, and the scope. They did have that jury instruction. So to the extent that he's correct, that a non-compete would have to be reasonable in scope, the jury was permitted to find that? Correct. Okay. But in a contractual . . . I mean, there was a jury instruction to that effect. Yes? I was going to ask you about these damages. You got about a million and a half for breach of contract and almost a million for unfair competition. Are these overlapping damages so that you're entitled only to one and a half million, or you multiply or add those two together, cumulative? One, they're cumulative, and two, the jury found them separately. That doesn't mean that when one looks at the record, one can not say that as a matter of law, there were no separate damages proved in connection with the unfair competition. Try that claim. Let me answer that, if I may. The unfair competition dealt with fraudulent activities by bars in foreign markets. Zone X, the fact that they labeled things. They had bars' products, bottles, and then they put Rizalone over it, where they had convention shows, and that's in the . . . So how did you go about proving your damages? With an expert. We had an expert. I seem to remember that he did not separate out the damages in an attempt to indicate what was attributable to things like slapping the labels and that sort of thing and the breach of contract. May I respond? Sure. The damages that he penciled on the board for the damages were $2.6 million. The jury adds the damages for all the wrongs and . . . Did he make any effort to . . . Apportion? Yeah. He did not, but the jury was given the information of $2.6 million of total damages. They went under that $2.540, if I recall. They got pretty close to it. I admit that I was very happy with their result. They were asked to determine which damages belonged to breach of contract, and I argued this, and which belonged to the unfair competition. The jury had the information from the expert as to what happened in each instant and how . . . we had graphs showing what happened here and what happened there. The answer to your question is they had ample information to segregate the damages for breach of contract and the damages for unfair competition. Nobody's complaining about any instruction that might have been given about causation, right? They waived that, yes. Well, you're not . . . I mean, it's just not an issue as far as the jury instructions are concerned. No. I mean, there was no question that the damages . . . that they could . . . You know, you might have been entitled to get a $2.6 million verdict for the breach of contract, but that's not the same thing as saying you're entitled to almost a million for the unfair competition. That's absolutely correct. However, when you try to . . . when an expert says, here's . . . it wasn't like he just said $2.6 million for a contract. We had charts showing what caused what. The charts had . . . I have the charts. They did have dollars associated with each thing? Yes. I didn't . . . okay, I didn't see that. I thought that it was just geographic. It may have been . . . Country would . . . He added dollars to them in his testimony. I actually was . . . I didn't see it on a chart. It may not have been, but he added dollars, and I actually was there. But, I mean, for this label slapped on this product amounts to an appreciable damage feature? You know, we're talking about numerous wrongs. This is all part of the breach. I know there was an objection, but I'm having a little trouble with that. You know there was no objections in what you're saying. And I hear you, and I'm saying to you this. The separation of these two damages and the calculations as to why the jury found some of the damages to be the unfair competition and why some of the damages were breach of contract, why the jury found one or the other after the expert testified, they categorized these. And I actually, in a closing argument if I recall, indicated that they could categorize them either as breach of contract or as unfair competition. And so, you know, trying to go back . . . It only becomes unfair by virtue of the breach, does it not? It only becomes . . . no. It only becomes unfair because there was a contract. I can have a contract and not have a breach of that contract or have either or both if I do something like label something with the wrong label, call McDonald's Arby's or something to that effect. And that's a wrong, separate from the breach of contract. And that's what the Michigan law says. And so when you . . . by trying to separate . . . the jury separated those damages because they found their actions horrific as to what occurred. And I think . . . Horrific. Not horrific. I'll strike horrific. What? I've been up all night. Did this agreement preclude the plaintiff from using some similar product but with a different name? Like putting Risolon on it? Or did they . . . were they completely barred from ever competing in an area where you claim that you had the right to . . . The same product and calling it the same product on their website, calling it . . . labeling it the same product. I mean, you know, when you . . . Did they say Risolon is the same thing as . . . Yes, on their website they said that and they even had the labels switched from bottles. So, I mean, if Apple phones come in and then you call your Apple phone a Nectarine and you have the exact same thing with a little picture of the Nectarine on here and all the same features, I'm going to tell you, Apple will be here in court in front of you guys saying, This is an Apple. They may call it a Nectarine and they have the Apple logo on here that they put the Nectarine over. They could have marketed that product without that confusion of labels, could they not? I mean, they could have put out something that was barred and called it Apple and not had it on the website. If it was the same . . . where they're saying it's the same exact item. I mean, I suppose we're getting into picking some kind of . . . But, you know, in this day and age, if you give away the rest of the world, 50%, and now, I mean, all the rest of the world, and you the next day make the Nectarine or make the Risolon, exactly the same thing, exactly the same bottling, exactly the same look, I'm not sure that this is what international trade or what we want. And this is what really happened. I would like to say one more thing. I mean, look, these guys did it for 30 years. The fathers knew the gig. The sons come in and change the gig because they want a bigger bite of the Apple, so to speak. And I know, not going back to the other . . . I didn't mean that. I mean, I'm sorry, but . . . But you mean that they observed the territory agreement before, not to compete. Yeah. The fathers did it all. That's what happens in this world with fathers and sons. I mean, the fathers knew the gig, a half a million dollars in 73. I was there. I'm not saying how many of you were there because I don't want to go into age here. It was a lot of money. It was forever for guys that started in a garage. I think now you're emoting. Sorry. I have emotion about this case. Well, your time is up. Let me just say one thing that I was trying to search my memory for. I think we thought we needed argument in this case. However, it does strike me that when Mr. Susser moved to change the date of argument, that rather than opposing that, you might have said if you didn't need argument, I'll waive argument if you'll waive argument. But instead, you opposed it, and then you come tell us you don't need argument. And the reason we wouldn't change his trial date is we didn't think it was appropriate since he didn't actually have a conflict. And since we didn't want you to be put in the position that you would feel that he had successfully delayed the hearing of the appeal, and then you come tell us you don't need argument. So you just might think these things through. I apologize, and I hope that . . . I apologize. You don't have anything to apologize for. It's no big deal. It was just a . . . Shocker. Huh? A shocker. No, it wasn't a shocker. It was just something that the court needed to say to a lawyer. Fine. Okay. Have I answered all your questions? Yes. All right. We're ready for Mr. Susser. Thank you. So there were no objections to the jury instructions because we had already objected to the theory several times. The jury instruction would have been appropriate if it had been for the right theory. We couldn't do anything at that point. I mean, after all . . . Do you think you preserved the objection? Absolutely. By virtue of the JMOL or what . . . By virtue of . . . Well, there was first a motion for summary judgment asking that . . . and that was denied. Then there was a motion and several motions in limine. Then two JMOL, 50A and 50B. Ultimately, they're asking the same question. This one and a half page assignment, was it unambiguous as the court said it was? If it's unambiguous as the court said it was, no finding of ambiguity, the court had an obligation under Rory to interpret it before sending it to the jury. If it was a non-compete, then under certified restoration, this court's decision, Judge Hood had an obligation to find that the non-compete was reasonable. And she didn't do any of that. Because she didn't do any of . . . none of that was done, what the jury had was, on the one hand, being told that the party . . . BPI alleges the parties entered into an agreement that prevented bars from competition with BPI. That's what the judge said to the jury. In their appellate response, what do they write? Appellee BPI agrees that the evidence failed to establish any non-compete provision. They admit there's no non-compete provision. They then go on to say, the issue is not whether a breach of an implied non-solicitation covenant existed between bars and BPI. Now they're saying, no non-compete, no non-solicitation, but that was the case that went to the jury. That's the case we were forced to argue against improperly because the judge, the trial court judge, did not do the threshold duty of interpreting the contract as is required under Michigan law and this court's law. You objected . . . you preserved your objection for the trial of the counterclaim, entirely. But you . . . you did want it to go on your claim, right? We did. And up until the end, we thought maybe we'd be a plaintiff. We were switched around before closing and became the defendant. But we have a valid trademark case that, ironically, the court did not act as a gatekeeper on the counterclaims at all. And yet, on our claims, before discovery, we were thrown out based on a faulty reading of the Lanham Act. Use in commerce specifically says in the Lanham Act, 1141A, says use of commerce including advertising. No requirement of sale, but the court found there was a requirement of sale. That's simply improper under the law. We should have been able to present a trademark infringement case. Well, was that presented to the jury? It was presented to the jury. There was, in fact, it was agreed that there was likelihood of confusion, no challenge to likelihood of confusion, valid trademarks, valid and enforceable, was stipulated by BPI. And the fact that they marketed to people in the United States at a US trade show, the largest trade show, was also stipulated or undisputed. None of these facts were disputed, and yet the judge said, because I ruled at a 12B6, you can't take it to the jury. So it was not presented to the jury? I'm sorry, Your Honor. There was a presentation of evidence, but the jury was not given our trademark. It didn't have a verdict on your... I'm sorry, Your Honor. It had no verdict on your claim. No verdict on the claim, exactly. Go back, if you would, counsel, to the preservation of this issue. You know, I understand when counsel is put to the wall here, but having asked and asked and asked, how many... Where is the preservation of these errors? In the motion for summary judgment, you raised the very points that you're making here today. Yes, Your Honor. That it was ambiguous. That there was no non-compete agreement. It's a simple assignment, Your Honor. We said that, and we said... Summary judgment, which other... In a motion to eliminate, Your Honor. There's a motion to eliminate, among others, for RIS loan. RIS loan makes up 98% of the damages, Your Honor. In 1973, we didn't own RIS loan and could not have transferred it as part of the assignment. That's basic law. You cannot transfer or assign what you don't own. We weren't able to transfer RIS loan, and under even the broadest interpretation, RIS loan would not be included in any kind of non-compete if that's the theory that's at issue, but apparently it's been disavowed. They say you put it on a website and said that's the same thing. That's simply not true. Bars Products, Inc. has a website in the United States. I mean, it's presumably available across the world. We assume it is, and that shows our line of products. And a RIS loan line of products. But no one has ever said, tried to market RIS loan as if it's Bars Leaks. In fact, there's no mention of Bars Leaks on the RIS loan bottle. It's RIS loan. It's a new company. It was a different company that had a separate brand, probably a stronger brand than ours, because it had been operating since 1921. We bought it in 2006 and began selling it globally in 2007. RIS loan had been sold globally. We just continued that. That's all we were doing. And now they're saying because the damages that they have for Bars Leaks sales are $22,000 by their own admission, they're bootstrapping the RIS loan sales, even though RIS loan was never any, no one even thought of RIS loan when it came to this agreement. The chaplain says you're putting stickers over the top of the Bars product and calling it RIS loan. That's not true. If anything, Your Honor, that was undeceived because we were trying to cover up. I mean, there was no deceit there. What it was was there was a trade show. We wanted to get product in. The undisputed evidence is we covered up the Bars Leaks with RIS loan because that was our current label we wanted to use and sent them there. There's no deceit. In fact, Your Honor, Judge Hood found in denying their motion for injunction there was no public deceit, no evidence of deceit of the public, but that was required for their unfair competition claim because they needed a separate duty, and that separate duty had to be deceit of the public. There is none, no evidence. We thank you both for your argument. We'll consider the case carefully. Thank you. Thank you, Your Honor.